| | | |
|---|---|---|
| ERIC CLEM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 4:24-CV-25-KAC-MJD |
| | ) | |
| COFFEE COUNTY, TENNESSEE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

This action is before the Court on "Defendant Coffee County, Tennessee's Motion for Summary Judgment" [Doc. 26]. For the reasons below, the Court grants Defendant's Motion.

## I. Background[1]

From 2018 to November 2022, Plaintiff Eric Clem worked at the Sheriff's Department in Coffee County, Tennessee as a School Resource Officer (SRO) at Coffee County High School (CCHS) [Doc. 1 ¶¶ 10, 26]. As an SRO, Plaintiff carried a firearm and was "responsible for the safety of the children" [Doc. 40-1 at 3 (Deposition of Eric Clem ("Clem Dep.") 10:25-11:8)].

Since 2007 or 2008, Plaintiff has dealt with "ruptured disks" in his back [*Id.* at 3-4 (Clem Dep. 11:25-15:9)]. During the relevant time, his condition limited his ability to walk, sit, and stand for extended periods and periodically caused him "severe pain" [*Id.* at 9-10 (Clem Dep. 35:18-37:4)]. Prior to his termination, Plaintiff underwent four (4) surgeries to address his back condition, the most recent in 2019 [*Id.* at 4 (Clem Dep. 16:7-21)]. After each surgery, he gave

---

[1] Because Plaintiff Eric Clem is the nonmoving Party, the Court describes the facts in the light most favorable to him. *See Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Defendant "his doctors' notes" [*Id.* at 5 (Clem Dep. 17:2-7)]. That "documentation" went into Plaintiff's "file" [*See id.* (Clem Dep. 19:19-23)].

On August 28, 2020 Plaintiff received a thirty (30) day supply of oxycodone pursuant to a prescription [*See* Doc. 37-5 at 2]. This was his most recent prescription or refill of oxycodone before October 2022 [*See* Doc. 40-1 at 8 (Clem Dep. 32:19-24)]. He did not seek, or receive, Defendant's permission to work while taking oxycodone or another opiate [*See id.* at 6 (Clem Dep. 23:15-24:3)]. The last documentation Plaintiff provided to Defendant about his use of oxycodone or another opiate "would have been [from his] surgeries from 2019" [*Id.* at 8 (Clem Dep. 30:3-10)]. But Defendant maintained that "all the administration knew that [he] was on medication due to [his] back surgeries" at the time of the surgeries [*See id.* at 6 (Clem Dep. 24:10-25)].

At some unknown points, Plaintiff requested that a second SRO be placed in CCHS [*Id.* at 10, 26 (Clem Dep. 37:22-38:7, 103:9-14)]. At his deposition, Plaintiff explained that he made this request because "1,500 kids is hard for one SRO to be in charge of their safety and security" [*Id.* at 25 (Clem Dep. 97:11-19); *see also id.* at 26 (Clem Dep. 104:11-25)]. Plaintiff also said that he made this request so that he could "limit" "walking, sitting, standing, anything that interfered with the pain" in his back [*Id.* at 10 (Clem Dep. 37:17-38:7)]. But he offers no evidence that he made that connection when communicating the request to anyone affiliated with Defendant. Other SROs too discussed the idea of placing a second SRO at CCHS, and Sheriff Chad Partin campaigned on the idea [*See id.* at 24, 25 (Clem Dep. 95:4-7, 97:7-10)]. Plaintiff did not ask for any other "accommodation" [*See id.* at 10, 24 (Clem Dep. 38:10-17, 95:19-23)].

Defendant maintains a "Substance Abuse Policy Statement" ("the Policy") "pursuant to [Tennessee Code Annotated] Section 50-9-100" [Doc. 37-1 at 1]. The Policy contains four (4) relevant requirements. ***First***, the Policy requires an employee to undergo a drug test anytime he

2

is "involved in on-the job accidents where personal injury . . . occurs" [Doc. 37-1 at 7]. **Second**, it prohibits an employee from "us[ing] prescription drugs illegally, i.e., to use prescription drugs that have not been legally obtained or in a manner for a purpose other than as prescribed" [*Id.* at 1]. **Third**, it requires "employees who are prescribed drugs or medications . . . that may affect their physical or mental capacities to perform their job" to "inform either their supervisor or a manager of their use of such drugs or medications" [*See id.* at 4]. Failing a drug test or failing to report prescription drug use is grounds for discipline, including termination [*See id.* at 1, 4]. **Fourth**, a positive drug test must be reported to Defendant's Medical Review Officer (MRO), who must speak with the employee and give him the chance to explain the drug test before reporting it to Defendant [*See id.* at 3, 5].

Since 2004, Defendant has terminated all three (3) employees who violated the Policy[2] [Doc. 40-2 at 10 (Deposition of Heather Shelton ("Shelton Dep.") 36:12-37:1)].

On October 23, 2022, Plaintiff took oxycodone from his August 2020 prescription [*See* Docs. 40-1 at 12 (Clem. Dep. 48:4-14), 37-12 at 3]. On October 25, Plaintiff "tweaked [his] back" at work [Doc. 40-1 at 11 (Clem Dep. 43:3-14)]. He reported his injury to Sheriff Partin, Sergeant Nettles, or Sheriff Partin's administrative assistant, Jennifer Green [*Id.* at 11 (Clem Dep. 43:17-44:24)]. Sheriff Partin and Green instructed Plaintiff "to go get checked out and take a drug screen" [*See id.* at 13 (Clem Dep. 49:13-17)].

Later that day, Plaintiff went to Tri-County Drug Screening for a drug test [*Id.* at 13 (Clem Dep. 52:13-17)]. Before the test, he told Tri-County that he "couldn't remember all the medication

---

[2] Plaintiff's bald assertion that "there have been" "other county employees that have failed a drug screen and were not subject to discipline" but refusal to identify any employee based on "plead[ing] the fifth" and "retaliation" is not viable summary judgment evidence of the existence of any such employee [*See* Doc. 40-1 (Clem Dep. 108:10-109:18)].

3

[he] was on or what [he's] been prescribed in the past" and that Tri-County was "free to contact [his] pharmacist" [*Id.* at 14 (Clem. Dep. 55:14-21)]. Plaintiff did not report recently using oxycodone [*Id.* (Clem. Dep. 56:1-4)].

Plaintiff then went to Family Urgent Care, which cleared him to "return to work without limitations pending x-ray"[3] [*See id.* at 15 (Clem Dep. 57:13-58:10, 60:3-9); Doc. 37-8]. Plaintiff returned to work the next day and "was still doing the same as [he] normally was" [*See* Doc. 40-1 at 15 (Clem Dep. 58:18-60:22)]. Plaintiff's employment and his job responsibilities did not change between his reported injury on October 25 and his ultimate termination on November 3 [*Id.* at 16 (Clem. Dep. 61:5-10)].

But on November 2, Plaintiff received a call from "Kristi" at Tri-County Drug Screening, informing him that he tested positive for oxycodone [*See id.* (Clem Dep. 61:12-64:14)]. Plaintiff told her that he "had been prescribed them in the past," but Kristi refused Plaintiff's offer to provide the prescription or take a second drug test [*Id.* at 17 (Clem Dep. 66:16-24)].

That night, Tonia Lawson, a Tri-County Drug Screening employee, texted a copy of Defendant's positive drug test to Heather Shelton, Defendant's "Personnel Benefits Coordinator" [Doc. 40-2 at 6, 9, 10 (Shelton Dep. 17:19, 30:23-31:7, 33:2-4)]. Lawson told Shelton that Plaintiff had tested positive for oxycodone and had not presented any prescription information to the MRO [*Id.* at 9 (Shelton Dep. 32:18-20)]. Plaintiff never spoke with the MRO [Doc. 40-1 at 38 (Clem Dep. 152:14-17)]. Shelton then sent the positive drug test to Green and directed her to tell Sheriff Partin [*See* Doc. 40-2 at 41]. When Green asked Shelton about the consequences of the positive

---

[3] The Urgent Care report contains limits on Plaintiff's "capabilities" that are inconsistent with its assessment that Plaintiff could "return to work without limitations pending x-ray" [Doc. 37-8]. Those limitations are also inconsistent with Plaintiff's testimony that he was cleared to work without limitations [*See* Doc. 40-1 at 15 (Clem Dep. 57:13-58:10)]. Whatever the case, Plaintiff's precise limitations following his injury do not change the Court's analysis.

4

drug test, Shelton told her that this was "an automatic" termination because Plaintiff's "prescription has to be less than a year old" [*Id.* at 42].

Shelton and Green also discussed taking old medication. Shelton admitted to taking "an old antibiotic" and Green to taking medication "a few months" after it was prescribed [*See id.*]. In a conversation with Plaintiff, Captain Billy Butler told Plaintiff that he too had taken "old medication" [*See* Doc. 40-1 at 7 (Clem Dep. 25:17-25)]. The record does not show that any of this information was relayed to Defendant or a decisionmaker at Defendant at the time the old medication was taken.

On November 3, Plaintiff met with Sheriff Partin, Shelton, and others [*See id.* at 21 (Clem Dep. 81:20-83:21)]. Plaintiff admitted to taking oxycodone from a prescription that was "a couple years old" [*See* Doc. 37-17 (Termination Meeting Recording)]. Sheriff Partin told Plaintiff that his "hands are tied" by the Policy, Plaintiff's positive drug test was "zero tolerance," and state law required prescriptions to have been issued within six (6) months [*See id.*]. Plaintiff explained that he had thought he was taking a more recent prescription for hydrocodone and offered to take a second drug test [*See id.*]. Sheriff Partin declined [*See id.*]. He explained that Plaintiff's failure to report his use of a drug violated the Policy and required termination, even if the prescription were lawfully obtained [*See id.*].

Sheriff Partin asked Shelton for advice regarding the situation, but Sheriff Partin made the decision to terminate Plaintiff [*See* Doc. 40-3 at 7, 15 (Deposition of Chad Partin ("Partin Dep.") 21:22-22:17, 56:16-18)]. Sheriff Partin later testified that even if Plaintiff had a prescription for oxycodone, it "wouldn't have made a difference" in the action required by the Policy [*See id.* at 16 (Partin Dep. 58:12-14)]. Defendant's stated reason for Plaintiff's termination was "violation of policy T.C.A. – Section 50-9-100," Tennessee's Drug-Free Workplace Programs [Doc. 37-11].

5

Plaintiff filed suit, raising four (4) claims under the Americans with Disabilities Act (ADA) and a state law claim [*See generally* Doc. 1]. For the ADA claims, the Complaint asserts that Defendant: (1) discriminated against Plaintiff based on his disability and/or perceived disability (Count One), (2) failed to engage in the interactive process (Count Two), (3) failed to provide a reasonable accommodation (Count Three), (4) and fired him in retaliation for participating in a protected activity (Count Four) [*See id.* at 4-9]. For Counts One, Two, and Three, Plaintiff alleges that he is "disabled in that he had been diagnosed with and sought treatment for ruptured disks in his back, which impact[] the major life activities of walking, standing, performing manual tasks, working, and driving" [*See id.* ¶¶ 33, 41, 51]. The Complaint does not identify any other alleged disability or perceived disability [*See* Doc. 1]. Plaintiff is "[a]bsolutely not" "claiming a disability of drug addiction or dependency" [Doc. 40-1 at 22 (Clem Dep. 87:17-19)].[4] For Count Four, the Complaint alleges that Plaintiff "engaged in protected activity when he used prescription opiates to manage his back pain" [Doc. 1 ¶ 62]. The Complaint does not identify any other alleged protected activity [*See* Doc. 1].

Defendant moved for summary judgment on all claims [Doc. 26]. Plaintiff responded [Doc. 49]. And Defendant replied [Doc. 42]. The Parties "joint[ly] stipulate[ed]" to dismissal of Plaintiff's state law claim, [*see* Doc. 52], so that claim is no longer at issue, *see* Fed. R. Civ. P. 21.

---

[4] In interrogatories too, Plaintiff identified his only "disability at issue in this case" as "ruptured discs and pinched nerves in his back which have required numerous surgeries in 2007, 2013, and two surgeries in 2019" [*See* Doc. 26-12 at 2]. And Plaintiff is bound by the admissions he made in discovery. *See Borror Prop. Mgmt., LLC v. Oro Karric N., LLC*, 979 F.3d 491, 495 (6th Cir. 2020). So, any attempt to argue that a claim survives based on some other disability or perceived disability fails [*See* Doc. 40 at 14-15 (arguing that "Sheriff Partin perceived Mr. Clem as being a functioning drug user, an addict, as having a drug problem, and as a threat to himself or others because of his medication") (citations omitted)].

6

## II.    <u>Analysis</u>

Federal Rule of Civil Procedure 56 provides that the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Hart v. Michigan*, 138 F.4th 409, 416 (6th Cir. 2025).  The Court views the facts in the light most favorable to the nonmoving party and draws all reasonable inferences from those facts in his favor.  *See Matsushita Elec.*, 475 U.S. at 587; *Hart*, 138 F.4th at 416.  The moving party bears the burden of showing that no genuine dispute of material fact exists.  *See Scott v. First S. Nat'l Bank*, 936 F.3d 509, 517 (6th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986)).  But once that burden has been met, "the nonmoving party must put forth more than a scintilla of evidence to support its claims. Conjecture and conclusory accusations will not suffice."  *Walden v. Gen. Elec. Int'l, Inc.*, 119 F.4th 1049, 1056-57 (6th Cir. 2024) (cleaned up).  The nonmovant must present "evidence on which the jury could reasonably find for the plaintiff."  *Smith v. City of Toledo, Ohio*, 13 F.4th 508, 514 (6th Cir. 2021) (quotation omitted).

Under the ADA, the Court's analysis of Counts One, Two, and Three are related.  Section 12112 of the ADA prohibits an employer from discriminating "against a qualified individual on the basis of disability," the general theory of Count One.  42 U.S.C. § 12112(a).  A failure to make "reasonable accommodations" to "an otherwise qualified individual with a disability" may be discriminating, the general theory of Count Three.  *Id.* § 12112(b)(5)(A).  And Section 12112(b)(5) requires an employer to engage in an "interactive process" to determine what "reasonable

7

accommodations" are necessary for a "qualified individual with a disability," the general theory of Count Two. *See Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 570-72 (6th Cir. 2023).

But for purposes of Section 12112 of the ADA, "a qualified individual with a disability shall not include any employee or applicant who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use." 42 U.S.C. § 12114(a); *see also* 42 U.S.C. § 12210(a). "[D]rug" means "a controlled substance, as defined in schedules I through V of section 202 of the Controlled Substances Act" (CSA). 42 U.S.C. § 12111(6)(B). "[I]llegal use of drugs means the use of drugs, the possession or distribution of which is unlawful under the" CSA. *Id.* at § 12211(6)(A). But it "does not include the use of a drug taken under supervision by a licensed health care professional, or other uses authorized by the Controlled Substances Act or other provisions of Federal law." *Id.*

Oxycodone is a Schedule II controlled substance under the CSA. *See* 21 U.S.C. § 812; 21 C.F.R. § 1308.12(b)(1). It is illegal to possess oxycodone, unless "obtained directly, or pursuant to a valid prescription or order, from a practitioner." *See* 21 U.S.C. § 844(a). With exceptions not applicable here, a prescription for oxycodone must be "written," and it may not "be refilled." *See* 21 U.S.C. § 829(a). A practitioner can prescribe "up to a 90-day supply of a Schedule II controlled substance." *See* 21 C.F.R. § 1306.12; *see also* 21 U.S.C. § 821 (authorizing the Attorney General "to promulgate rules and regulations" about "dispensing of controlled substances"). And a patient must fill the entire prescription within "30 days after the date on which the prescription is written." *See* 21 U.S.C. § 829(f)(2).

Applying the law here, Plaintiff was not a "qualified individual with a disability" for purposes of Counts One, Two, and Three. Plaintiff admitted to taking oxycodone in October 2022 [*See* Doc. 40-1 at 12 (Clem Dep. 47:14-48:14)]. At that time, his most recent oxycodone

8

prescription was a thirty-day supply issued in August 2020 [*See id.* at 8 (Clem Dep. 32:19-24)]. Even if it was lawful for Plaintiff to use the oxycodone in August 2020, he was not taking the oxycodone "under the supervision by a licensed health care professional" over two (2) years later in October 2022. *See* 42 U.S.C. § 12111(6)(A); *Ferguson v. Mem'l Health Care Sys., Inc.*, 1:20-CV-346-DCLC-SKL, 2021 WL 6275333, at *3 (E.D. Tenn. Sep. 28, 2021); *see also Zenor v. El Paso Healthcare Sys, Ltd.*, 176 F.3d 847, 853-55 (5th Cir. 1999). And his use of that oxycodone in October 2022 was not "authorized by the" CSA either. *See* 21 U.S.C. §§ 829, 844. So, Plaintiff was "engaging in the illegal use of drugs" under the ADA. *See* 42 U.S.C. § 12114(a). And he is not a "qualified individual with a disability" under the ADA if Defendant "acts on the basis of such use" of oxycodone. *See id.*; *Ferguson*, 2021 WL 6275333, at *3. That is exactly what Defendant did here. Plaintiff admits that he "was terminated for taking" oxycodone [*See* Doc. 40 at 16]. Defendant too agrees that it fired Plaintiff because of his unlawful use of oxycodone, along with his violation of the Policy [*See* Docs. 37-17 (Termination Meeting Recording); 37-11].

Plaintiff argues that "the oxycodone in question was legally prescribed to" Plaintiff and that Plaintiff "was terminated for taking a legally prescribed medicine" [Doc. 40 at 16-17]. But as a matter of law, the fact that the oxycodone was legally prescribed in August 2020 does not make Plaintiff's use of that oxycodone in October 2022 other than "illegal." *See* 42 U.S.C. § 12114(a). And even viewing the facts in the light most favorable to Plaintiff, there is not "evidence on which the jury could reasonably find for" him on this point. *See Smith*, 13 F.4th at 514. Further, the fact that Plaintiff's violation of the Policy, by using the oxycodone and failing to notify Defendant of his use, provided an independently-sufficient basis for Defendant to fire Plaintiff, [*see* Doc. 40-3 at 16 (Partin Dep. 58:12-14)], does not change the conclusion that Defendant "act[ed] on the basis

of" Plaintiff's "illegal" use of oxycodone, *see* 42 U.S.C. § 12114(a).  So, Defendant is entitled to judgment on Counts One, Two, and Three on this basis.  *See* 42 U.S.C. § 12112(a), (b).

Even if the Court were to set this statutory disqualifier aside, Defendant is entitled to summary judgment on Counts One, Two, and Three for other reasons too.  Start with Count One.  To succeed on a claim for disability discrimination, a plaintiff must first make a prima facie case of discrimination. *Edwards v. Shelby Cnty., Tenn.*, 159 F.4th 489, 498 (6th Cir. 2025).  If a plaintiff meets his initial burden, "the burden shifts to the employer to 'demonstrate that there was a legitimate, nondiscriminatory reason for the adverse employment action.'" *Hrdlicka*, 63 F.4th at 567 (quoting *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 395 (6th Cir. 2017)).

If an employer meets its burden, "[t]he burden then shifts back to the employee to show that the purported nondiscriminatory reason 'was actually a pretext designed to mask discrimination.'" *Id.* (citation omitted).  The employee may generally attempt to do so by "showing that [the defendant's] proffered reason:  (1) had no basis in fact, (2) did not actually motivate the adverse employment action, or (3) could not motivate the adverse employment action." *Hayes v. Clariant Plastics & Coatings USA, Inc.*, 144 F.4th 850, 864 (6th Cir. 2025).  Different treatment of "similarly situated" coworkers may show pretext, provided that there is not "'differentiating or mitigating circumstances' that would merit different treatment." *See Williams*, 847 F.3d at 398 (quotation omitted).  And an employee cannot demonstrate pretext merely by asserting that his employer's stated reason was false if the employer "honestly believed its proffered reason" "based on particularized facts that were before it at the time the decision was made." *See Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 515 (6th Cir. 2021) (quotation omitted).

Presuming that Plaintiff made a prima facie case, Defendant provided a legitimate reason to fire Plaintiff.  Violation of a substance abuse policy is a legitimate reason to terminate an

10

employee. *See Blazek v. City of Lakewood, Ohio*, 576 F. App'x 512, 516 (6th Cir. 2014); *Adkins v. Excel Mining, LLC*, 214 F. Supp. 3d 617, 623 (E.D. Ky. 2016).

And Plaintiff has not shown a triable issue of pretext. Plaintiff argues that Defendant's stated reason was pretext because: (1) he never engaged in the use of illegal drugs; (2) Defendant denied him the opportunity to prove he had a legal prescription and did not follow the Policy; and (3) the Policy was not actually zero tolerance, and others who took out-of-date medicine were not terminated [*See* Doc. 40 at 20-22]. Each argument fails.

*First*, even if Plaintiff's use of oxycodone in October 2022 were legal (a proposition hard to square with the law), he failed to comply with the Policy because he did not inform his supervisor or manager of his use of oxycodone in October 2022 [*See* Docs. 40-1 at 6 (Clem Dep. 23:15-24:3), 37-1 at 4]. And awareness of opiate use from a medical file after a 2019 surgery did nothing to inform Defendant of Plaintiff's use of oxycodone in October 2022 [*See* Doc. 40-1 at 6, 8 (Clem. Dep. 24:19-25, 30:3-10)].

*Second*, any opportunity to prove that Plaintiff had a legal prescription or failure to follow the Policy to a T does not move the needle. Plaintiff's failure to notify Defendant that he was taking oxycodone in October 2022 was a violation of the Policy and grounds for termination, even if Plaintiff were legally prescribed oxycodone at the time [*See* Doc. 37-1 at 4]. And Defendant relied on that failure as a basis for firing Plaintiff [*See* Docs. 37-11, 37-17 (Termination Meeting Recording)]. Further, even if the Policy allowed Plaintiff to contest his positive drug test with the MRO, the Tennessee law the Policy is "pursuant to" limits an MRO to considering prescriptions issued within six (6) months of a positive drug test [*See* Doc. 37-1 at 1]. *See* Tenn. Code Ann. § 50-9-116(b). So, the MRO could not have considered Plaintiff's at least two-year-old oxycodone prescription. And Plaintiff has identified no evidence connecting the failure to allow contestation

11

with the MRO to any showing of pretext by Defendant. At most, a jury could infer that Defendant did not follow every word of its own Policy, but that fails to show pretext for disability discrimination in context.

*Third*, the comparators Plaintiff presents are easily distinguishable, and Defendant had an honest belief that the Policy was zero tolerance on the relevant point. Start with the available comparators. Green was an administrative assistant who admitted to taking some medication "a few months" out of date [*See* Doc. 40-2 at 42]. Shelton was a benefits coordinator who admitted to taking "an old antibiotic" [*See id.*]. Neither is similarly-situated to Plaintiff who (1) took an opiate over two (2) years after its prescription date, (2) carried a firearm in a high school, and (3) was responsible for the safety of children [*See* Doc. 40-1 at 3 (Clem Dep.) 10:25-11:8)]. *See Williams*, 847 F.3d at 398. Captain Butler's admission that he has taken "old medication" does not suffice either [*See* Doc 40-1 at 7 (Clem Dep. 25:21-25)]. There is no evidence of what "medication" Captain Butler took, how old any prescription was (presuming one was required), the context in which Captain Butler took the medication, or that Defendant was aware of his use.

And even if Plaintiff was correct that the Policy is not explicitly zero tolerance, the legally-relevant individuals honestly believed that it was. Sheriff Partin, who ultimately made the decision to terminate Plaintiff, said that his "hands were tied" by the Policy [*See* Docs. 37-17 (Termination Meeting Recording); 40-3 at 7 (Partin Dep. 21:22-22:17)]. To the extent that Partin relied on Shelton's advice, Shelton stated that Plaintiff's positive drug test required "an automatic" termination [*See* Doc. 40-2 at 42]. There is not a genuine dispute of material fact regarding whether Sheriff Partin and Shelton honestly believed that Plaintiff's violation of the Policy required termination of his employment, and that conclusion was reasonable based on the evidence before them. *See Briggs*, 11 F.4th at 515.

Finally, to ensure that the judicially-created *McDonnell Douglas* framework does not lead the Court too far from the text of the ADA, there is no evidence that would allow a jury to determine that Defendant terminated Plaintiff "on the basis of" his claimed back disability [*See* Doc. 1 ¶ 33]; 42 U.S.C. § 12112(a); *see also Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012) (en banc). So, Defendant is entitled to summary judgment on Count One on this basis too.

Defendants are also entitled to summary judgment on Counts Two and Three for another independent basis—there is not evidence in the record connecting Plaintiff's request for an extra SRO to his alleged disability or medical restrictions. To prove a claim for failure to accommodate (Count Three) or failure to engage in the interactive process (Count Two), Plaintiff must first "request[] an accommodation" from his employer under the ADA or in some way "link[]" his "request to a disability." *See Hrdlicka*, 63 F.4th at 570, 571-72. "Although a plaintiff need not use the word accommodate or disability, at a minimum he must make it clear from the context that the request is being made in order to conform with existing medical restrictions." *Deister v. Auto Club Ins. Ass'n*, 647 F. App'x 652, 657 (6th Cir. 2016) (quoting *Leeds v. Potter*, 249 F. App'x 442, 449 (6th Cir. 2007)) (cleaned up). The employee must "provide their employer[] with a sufficient basis to understand that the request is being made because of their disability." *Id.* at 658 (citing *Stanciel v. Donahoe*, 570 F. App'x 578, 583 (6th Cir. 2014)).

Here, there is not evidence in the record that would allow a jury to determine that Defendant should have interpreted Plaintiff's request for a second SRO at CCHS as a request for an accommodation for his back condition under the ADA. Plaintiff has presented no evidence that he ever connected his request to his disability when communicating with Defendant or a relevant representative. *See Hrdlicka*, 63 F.4th at 570. And, on this record, a jury could do no more than

13

speculate that Defendant could have reasonably interpreted the request for a second SRO as a request for an accommodation under the ADA. Even Plaintiff's post hac stated reasons for needing a second SRO would apply if he were not disabled—it is hard for any one person to keep 1,500 children safe [*See* Doc. 40-1 at 25 (Clem Dep. 97:11-19)]. And others, including Sheriff Partin, thought it wise to place a second SRO at CCHS, independent of any connection to medical need or disability [*See* Doc. 40-1 at 24, 25 (Clem Dep. 95:4-7, 97:7-19)]. So, Defendant is entitled to summary judgment on Counts Two and Three on this basis too.

That leaves Count Four. "To establish a prima facie case of retaliation," as relevant here, Plaintiff must show that he "engaged in activity protected under the ADA." [5] *Edwards*, 159 F.4th at 503 (quoting *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014)) (cleaned up). But this provision "protects individuals only from retaliation" for "engaging in" "activity covered by the ADA." *Rorrer*, 743 F.3d at 1046 (citing 42 U.S.C. § 12203(a)). And even if Plaintiff makes a prima facie case, the burden shifts to Defendant to show a legitimate, non-pretextual reason for terminating him; and then back to Plaintiff to show pretext. *See A.C. ex rel. J.C. v. Shelby Cnty. Bd. Of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013).

Plaintiff's retaliation claim does not survive summary judgment. ***First***, Plaintiff cannot make his prima facie case because, as discussed above, he was "engaging in the illegal use of drugs" under the ADA in October 2022 and thus not engaged in an activity protected under the

---

[5] The Complaint only alleged one "protected activity"—"use[] [of] prescribed opiates to manage his back pain" in October 2022 [Doc. 1 ¶ 62]. In the Response, Plaintiff attempted to defend against summary judgment by identifying new "protected activit[ies]" in which he engaged [*See* Doc. 40 at 19]. But Plaintiff cannot amend his Complaint in his Response. *See Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007) ("To the extent . . . [Plaintiff] seeks to expand its claims to assert new theories, it may not do so in response to summary judgment") (citations omitted). And he did not seek leave to amend. So, these new purported protected activities do not prevent summary judgment on Plaintiff's retaliation claim.

ADA. *See* 42 U.S.C. § 12114(a). ***Second***, even if he made his prima facie case, violation of the Policy's substance use requirements is a legitimate reason to terminate Plaintiff. *See Blazek*, 576 F. App'x at 516. And ***finally***, as discussed at length above, Plaintiff has not pointed to evidence showing that this was pretext for retaliation either. Accordingly, Defendant is entitled to summary judgment on Count Four.

III. **Conclusion**

For the above reasons, the Court **GRANTS** what remains of Defendant Coffee County, Tennessee's "Motion for Summary Judgment" [Doc. 26]. An appropriate judgment shall enter.

SO ORDERED.

_____
KATHERINE A. CRYTZER
United States District Judge

15